Don C. YOUNG, Administrator of the Estate of Peggy Marlene Young, Deceased, and Don C. Young, Individually, Appellants,

v.

J. W. DE BORD and Evelyn DeBord, d/b/a J. W. De Bord Coal Yard, and Dewey Hughes, Appellees.

Court of Appeals of Kentucky.

Nov. 22, 1961.

Lewis & Weaver, William J. Weaver, London, John C. Prather, Viley O. Blackburn, Somerset, for appellants.

Fritz Krueger, C. H. Neikirk, Somerset, for appellees.

STEWART, Judge.

In the late afternoon of October 16, 1957, Peggy Marlene Young, 24 years of age, was driving the car of her father, Don C. Young, appellant herein, on State Highway

192 near Somerset. It was raining and overcast and the road was wet. Appellee, Dewey Hughes, was operating a loaded coal truck owned by appellees, J. W. and Evelyn DeBord, d/b/a J. W. DeBord Coal Yard. The truck and the car were travelling in opposite directions and collided on a curve. Peggy Marlene Young was killed, the car was almost totally destroyed, and the truck was badly damaged.

On October 13, 1958, Don C. Young, as administrator of his daughter's estate, filed a complaint against appellees, alleging the negligence of the truck driver caused his daughter's death and asking $100,000 in damages. On January 21, 1959, appellees filed an answer denying the accident was the result of Hughes' negligence. J. W. and Evelyn DeBord also filed in their answer a counterclaim against Peggy Marlene Young's estate for $2,297.92 for damages to their truck, which they averred were produced by Peggy Marlene Young's reckless operation of her father's car. On May 18, 1959, appellant denied the allegations in the counterclaim and also filed an amended complaint seeking recovery from appellees, in his individual capacity, of $2,050 for the complete loss of his car.

The jury found Peggy Marlene Young and Dewey Hughes, the drivers of the two motor vehicles which collided, equally guilty of negligence and allowed none of the parties to recover damages. The Youngs have appealed.

They first argue vigorously that the trial court erred in submitting to the jury Instructions IV, VII and VIII. The record discloses they objected to the giving of these instructions upon the ground there "is no evidence in the record" upon which to base them. On this appeal they undertake to point out specific defects which are raised here for the first time, and this brings up the question of whether they can assign one reason for objecting to an instruction in the trial court and a different one on this appeal.

CR 51 requires that any ground interposed to the giving of an instruction should be set forth in a timely manner and should be definite enough to bring into focus the precise nature of the alleged error. In Clay CR 51, comment 4, p. 458, this statement appears: "The Rule in effect condemns the general objection to the giving or failure to give an instruction. It requires a party making an objection to state specifically (a) the matter to which he objects, and (b) the grounds of his objections. One important purpose of this requirement is to limit the use of a general objection as a device in securing a subsequent reversal, when the court may well have obviated the error if its attention was directed at the proper time to the particular matter about which the party may subsequently complain on appeal."

Appellants in the trial court protested the submission of the instructions on a general ground. On this appeal they have changed their approach and now undertake to pinpoint certain alleged errors. Obviously, CR 51 condemns such a practice and, in consequence, we must hold they cannot now be heard on these matters. See the recent case of Chaney v. Slone, Ky., 345 S.W.2d 484, where the principle we have discussed was considered and resolved in conformity with the end result we have reached.

It is next insisted the lower court erred because it refused to instruct the jury on last clear chance. Appellants' theory that such an instruction should have been submitted rests upon the conclusion drawn from a fragment of evidence extracted from the testimony of Roy Paul Dykes, a witness who appeared in behalf of appellees. Dykes, who arrived at the site of the mishap soon after its occurrence, stated that Hughes, the truck driver, when asked how the accident happened, told him he saw the Young car about 400 or 500 feet away "coming sideways and skidding." This same witness also testified he examined the car and the truck skid marks near the place

of collision, and these revealed the car was straddling the center line and the truck's wheels in its traffic lane did not come nearer than 30 inches to this same line. Hughes testified he was going around a curve at 15 or 20 miles per hour just before the two vehicles met; he first observed the Young car when it was 50 to 100 feet distant at which time it was travelling 50 to 60 miles per hour, "occupying the middle of the road"; and he then cut to his right as much "as he could."

If Hughes was in his traffic lane at the instant he saw the Young car, it then being apparently out of the control of its driver while still 400 or 500 feet down the road, there was little else that he could do other than pull over to his right as far as possible. It is uncontradicted that this is exactly what he attempted to do. It is conceivable he could not then predict whether the car's operator would be able to regain control of it, or whether it would run off the other side of the road and away from the truck, or whether it would eventually make contact with the truck despite any precautions he might take.

 In applying the last clear chance doctrine to a given situation, the defendant must, as a matter of fact, have a last clear chance and not a speculative or a possible chance to avoid the accident. See Swift & Co. v. Thompson's Adm'r, 308 Ky. 529, 214 S.W.2d 758. Where a motorist, as in this case, was faced with an emergency that made it impossible for him to know what to do, he should not be held responsible for his failure to follow what is afterwards considered the correct course of action. Although the truck driver was perhaps able to control his own vehicle, under the facts presented, he had no certain way of knowing what he should have done to escape colliding with an oncoming car running wild. Thus, in the case at bar, as Hughes had to conjecture what the ultimate direction and final effect of the Young car's uncertain movement under the circumstance might be, it cannot be

said he had a last clear chance to prevent their coming together.

The evidence of Gilmore Phelps, the sheriff of Pulaski County on the occasion of the accident, and of Jack Murphy and George R. Hall, troopers attached at the time to the Kentucky State Police, all of whom investigated the tragic event and testified as to it, is assailed because it is claimed no proper foundation was laid in order to qualify them to state what they saw. The chief contention is that it was not shown the conditions remained the same at the site from the time of the wreck until they arrived. Then, too, it is pointed out that, meanwhile, it had been raining steadily, it had become dark, and several motor vehicles had passed on the highway and some forty or fifty people had walked between and around where the car and the truck had come to rest.

 These three officers reached the scene of the mishap from approximately one to two hours after its occurrence. It would be a fair inference that no change had transpired during this interval except possibly as to skid marks or tire tracks made by the car and the truck upon the road; and none of the three witnesses undertook to testify concerning these on direct examination, because they said the rain had washed them away. However, appellants' counsel in cross-examining Trooper Murphy brought out certain testimony as to skid marks purportedly made by the truck which evidence had no material bearing on the case. The sum and substance of the testimony of these witnesses consisted of things of a durable nature they observed, namely, the positions of the two motor vehicles and the condition of each as a result of the wreck and the location on the highway of ridges or mounds of slack coal. They made certain measurements of fixed objects which they made statements about. They expressed no opinions and drew no conclusions from what they saw. Upon the whole, we believe this line of testimony was competent and admissible. Certainly

these officers could testify to what they observed, and this is all their evidence consisted of.

Other complaints are made in regard to certain testimony that was admitted and in respect to certain admonitions the trial judge gave. We have carefully considered all of these and we are of the opinion no error was committed by the action of the trial court in this connection.

Wherefore, the judgment is affirmed.